UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:19-CV-00059-GNS-CHL


BONNIE WHEELER                                                    PLAINTIFF

v.

JOHN WARD;
DAVID LEE; and
MARVIN RHINEHART                                                DEFENDANTS


**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment (DN 24)
and Motion to Strike (DN 47) and Plaintiff's Motion for Leave to Amend Scheduling Order and
File Amended Complaint (DN 29) and Motion for Leave to File Amended Complaint to Add
Newly Discovered Claims (DN 44). These motions are ripe for adjudication. For the reasons that
follow, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN
PART**, while all other motions are **DENIED**.

## I.     BACKGROUND

Plaintiff Bonnie Wheeler ("Wheeler") was hired by the Hardin County Sheriff's Office
("HCSO") in 1997 as a paid deputy and remained employed as such until the time of her
termination. (First Am. Compl. ¶ 9, DN 17).[1] On or about May 23, 2018, Wheeler was hand-
delivered a letter from Lee stating that it had "come to the attention of [the HCSO] that [Wheeler]

---

[1] Defendants Hardin County Sheriff John Ward ("Ward"), Hardin County Chief Deputy Sheriff
David Lee ("Lee"), and Hardin County Lieutenant Sheriff Marvin Rhinehart ("Rhinehart"), in their
motion for summary judgment, explicitly state that they "do not disagree with the facts as set out
in Paragraphs 9-27 of the Amended Complaint (DN 17)." (Defs.' Mot. Summ. J. 7, DN 24).

may have violated the general employment policies of" the HCSO, specifically, policies 1.060-.061 and 2.092-.092.  (First Am. Compl. ¶¶ 10-12; Compl. Ex. A, at 2, DN 1-1).

Policy 1.060-.061 prohibits employees "from making any public statements in any form concerning any pending criminal investigation without the prior permission of competent authority (except for a Defendant's name, age, residence, charge, identity of investigation agency)." (Compl. Ex. A, at 2).  In addition, Policy 2.090-.092 requires all employees "to treat official business of the HCSO as confidential."  (Compl. Ex. A, at 2).  Wheeler allegedly made statements regarding a criminal investigation of another deputy that violated both of these policies.  (Compl. Ex. A, at 2).

For these alleged violations, Wheeler was suspended without pay and was instructed to attend a meeting with Lee on May 25, 2018, and to keep the matter confidential.  (Compl. Ex. A, at 2).  On the morning of May 25, Wheeler met with Lee, Rhinehart, and County Attorney Jenny Oldham ("Oldham"), who questioned Wheeler regarding the veracity of the allegations outlined in the letter.  (First Am. Compl. ¶ 17).  Wheeler denied making any statements regarding open investigations or any statements to the public about Deputy Clennon Smith ("Smith"), his hiring, or a lack of disciplinary action taken against Smith.  (First Am. Compl. ¶ 21).  The meeting lasted approximately eight minutes and was characterized as an "Administrative Interview."  (First Am. Compl. ¶¶ 18-19).  No witness testimony was taken, nor were any witness statements shown or adverse witnesses identified; however, an audio recording of the meeting was made.  (First Am. Compl. ¶¶ 22-23; Compl. Ex. B, at 2, DN 1-1).

On May 30, 2018, Wheeler was terminated from employment with the HCSO for a violation of the policies referenced in the suspension letter.  (Compl. Ex. C, at 2, DN 1-1).  On June 15, Wheeler sent a letter to Ward and Lee "requesting a copy of all documentation regarding

the suspension that resulted in [her] termination . . . [including] all written complaints and documentation as well as audio and/or transcripts of the Administrative Interview . . . ." (Compl. Ex. D, at 2, DN 1-1). Rhinehart responded to Wheeler's letter, attaching several items. (Compl. Ex. E, at 2-7, DN 1-1). Included were three letters, one of them having ostensibly been notarized by Ward and another by Teal Richardson ("Richardson"), apparently a deputy sheriff at the HCSO. (First Am. Compl. ¶ 29; Compl. Ex. E, at 3-5; Pl.'s Mot. Leave File Am. Compl. ¶ 1, DN 44). The letters were written by different individuals, each claiming to have encountered Wheeler while she was out campaigning with Willie Oden ("Oden"), who had run against Ward for election as Hardin County Sheriff. (First Am. Compl. ¶ 29; Compl. Ex. E, at 3-5; Pl.'s Mot. Leave File Am. Compl. ¶ 1). The letters stated that Wheeler had discussed Smith, his actions, and the purported lack of disciplinary action taken against Smith. (Compl. Ex. E, at 3-5).

Wheeler brought the current action against Ward, Lee, and Rhinehart in their official capacities. (Compl. 1, DN 1). Wheeler subsequently filed an Amended Complaint asserting: (1) a 42 U.S.C. § 1983 claim against Ward in his official capacity for wrongful discharge pursuant to the First and Fourteenth Amendments; (2) official capacity claims against Ward, Lee, and Rhinehart for violation of the Kentucky Police Officers' Bill of Rights, Kentucky Revised Statutes ("KRS") 15.520; and (3) official capacity claims against Ward, Lee, and Rhinehart for violation of procedural due process under the Fourteenth Amendment. (First Am. Compl. ¶¶ 35-53)

Ward, Lee, and Rhinehart have since moved for summary judgment regarding immunity defenses on the Section 1983 claim against Ward and the Kentucky state law claims against Ward, Lee, and Rhinehart. (Defs.' Mot. Summ. J. 1). Wheeler has moved for leave to amend the scheduling order and to file two amended complaints, one seeking to assert individual capacity claims against Ward and Lee and one seeking to assert claims against Richardson in her individual

and official capacities.[2]  (Pl.'s Mot. Leave File Am. Scheduling Order 1, DN 29; Pl.'s Mot. Leave

File Am. Compl. 3, DN 44).  Defendants have also moved to strike Plaintiff's Third Amended

Complaint purporting to assert the aforementioned claims against Richardson.  (Def.'s Mot. Strike

1, DN 47; Proposed Third Am. Compl., DN 46-2).  Having been fully briefed, the motions are ripe

for decision.

## II.    JURISDICTION

This Court possesses federal question jurisdiction over Wheeler's federal law claims and

supplemental jurisdiction over Wheeler's state law claims.  *See* 28 U.S.C. §§ 1331, 1367(a).

## III.    DISCUSSION

### A.    Defendants' Motion for Summary Judgment

In ruling on a motion for summary judgment, the Court must determine whether there is

any genuine issue of material fact that would preclude entry of judgment for the moving party as

a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the

basis for the motion and identifying the evidence demonstrating an absence of a genuine dispute

of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party

satisfies its burden, the nonmoving party must then produce specific evidence proving the

existence of a genuine dispute of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986).

While the Court must view the evidence in the light most favorable for the nonmoving

party, the nonmoving party must do more than merely show the existence of some "metaphysical

doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

---

[2] Although Wheeler additionally sought to join the HCSO as a defendant, the parties have since
stipulated to the dismissal with prejudice of Wheeler's inclusion of the HCSO as a party to this
case.  (Stipulation Dismissal, DN 40).

586 (1986) (citation omitted). Rather, the nonmoving party must present facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

### 1. *42 U.S.C. § 1983 Claim*

The first claim at issue is Wheeler's Section 1983 action against Ward in his official capacity as Hardin County Sheriff. Ward, in his official capacity, believes he is immune from this claim. (Defs.' Mot. Summ. J. 11-13). While state law governs whether Defendants are immune from state law claims, federal law determines whether Defendants are immune from federal law claims. *Funke v. Coogle*, No. 3:11-CV-310-H, 2013 WL 209602, at *2 (W.D. Ky. Jan. 17, 2013) (citations omitted); *see also Jefferson Cty. Fiscal Court v. Peerce*, 132 S.W.3d 824, 836 (Ky. 2004) (relying on *Howlett v. Rose*, 496 U.S. 356 (1990), and noting that "state treatment of sovereign immunity is not relevant to a determination of whether a party is immune from § 1983 liability because only federal jurisprudence is controlling on this issue.").

"Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 n.55 (1978)). Wheeler's Section 1983 claim against Ward in his official capacity as Sheriff is therefore really an action against Hardin County. *See Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005) ("A suit against Sheriff Karnes in his official capacity is permissible under § 1983, and is equivalent to a suit against the entity on whose behalf he acts—Franklin County." (citing *Monell*, 436 U.S. at 690 n.55)); *Johnson v. Fink*, No. 1:99-CV-35-R, 1999 WL 33603131, at *3-4 (W.D. Ky. Sept. 17,

1999) ("Kentucky sheriffs are county officials."). For purposes of Section 1983, Hardin County is considered a municipality. *See Johnson*, 398 F.3d at 877 (treating Franklin County, Kentucky, as a municipality).

A municipality must be responsible for the violation of a Section 1983 claimant's constitutional rights before that municipality can be held liable to the claimant. *Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 382-83 (6th Cir. 2004) (citation omitted); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. "[A] municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 692). The plaintiff must "identify the policy, connect the policy to the [municipality] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 363-64 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)). Ward's sole argument for summary judgment in his favor on Wheeler's Section 1983 claim is that there has been no showing that Hardin County has any policy or custom of terminating an employee for "exercis[ing] their political voice." (Defs.' Mot. Summ. J. 12).

The U.S. Supreme Court outlined the analysis for identifying and connecting an alleged injury to an official municipal policy in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986): "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials

responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483-84 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).

> The official must . . . be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.

*Id.* at 482-83. The Court in *Pembaur* gave a particularly pertinent example of the application of this rule:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability.

*Id.* at 483 n.12 (emphasis in original).

Finally, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* at 480. Ward fails to acknowledge this possibility, simply claiming that Wheeler has failed to evince a Hardin County policy of firing sheriff deputies campaigning on behalf of individuals running for sheriff. *Pembaur* also makes clear, however, that "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy *with respect to the action ordered*." *Id.* at 481 (emphasis added); *see Johnson v. Hardin Cty.*, 908 F.2d 1280, 1286 (6th Cir. 1990) (evaluating official's responsibility for establishing final policy "*with respect to the subject matter* in question."

(internal quotation marks omitted) (emphasis in original) (citation omitted); *Bruce v. Cole*, No. 6:17-CV-3073-SRB, 2018 WL 5500011, at *3 (W.D. Mo. Oct. 29, 2018) ("A municipal official does not need to have final authority to make *all* employment policy in order to have final policymaking authority in the area of hiring or firing employees. . . . If [the Sheriff] has final policymaking authority [in the area of dismissing deputy sheriffs], then he is the relevant final policymaker for § 1983 purposes and his decisions pursuant to this authority constitute the official policy of [the] County." (emphasis in original) (citations omitted)). If Ward, as Hardin County Sheriff, did have final policymaking authority over deputy sheriff employment, then Ward's decision to fire Wheeler could give rise to municipal liability under *Pembaur*.

The Kentucky Supreme Court in *McClure v. Augustus*, 85 S.W.3d 584 (Ky. 2002), addressed the power of sheriffs over deputy sheriff employment:

> Section 99 of the Kentucky Constitution creates the office of county sheriff but is silent as to the power of that office to employ or to remove deputies. Thus, a sheriff has no constitutional right of either appointment or removal. Rather, a sheriff has a statutory right to appoint deputies and an implied, common-law authority to appoint deputies, which includes the authority to remove deputies at will.

*Id*. at 586 (internal citations omitted) (citation omitted). Under Kentucky Revised Statutes ("KRS") 70.030(1), "[t]he sheriff may appoint his or her own deputies and may revoke the appointment at his or her pleasure, except where that revocation is prohibited by the provisions of KRS 70.260 to 70.273." KRS 70.260 to 70.273 allow counties to create "deputy sheriff merit boards" that are charged with establishing deputy sheriff employment policy and overseeing deputy sheriff employment termination. *See* KRS 70.261, 70.270, 70.273; *see McClure*, 85 S.W.3d at 586 ("In enacting the Deputy-Sheriff Merit Board statutes, the General Assembly permitted [counties] to elect to transfer the executive power of removal from one executive, the sheriff, to another, the Merit Board, which is an administrative agency that acts in an executive

capacity when it makes personnel decisions." (citations omitted)). The parties have stipulated, however, that Hardin County has not created a deputy sheriff merit board. (Telephonic Conference, DN 52; Order 1, DN 53).

When looking at the evidence in the light most favorable to Wheeler, it appears that Ward possesses final policymaking authority over the employment of deputy sheriffs. *McClure* dictates that county sheriffs in Kentucky possess "an implied, common-law authority to appoint deputies, which includes the authority to remove deputies at will." *McClure*, 85 S.W.3d at 586. Sheriffs also have statutory authority to hire and fire deputies at will. KRS 70.030(1). The only limitation on the unfettered control Kentucky sheriffs have over deputy sheriff employment decisions comes from the creation of a "deputy sheriff merit board[,]" which Hardin County has not done. *See Elliott v. Lanham*, 540 S.W.3d 353, 355 (Ky. 2018) ("[B]ecause Boyle County does not have a deputy sheriff merit board, the due-process protections of KRS 70.260 through 70.273 do not apply in that county."). Ward has not identified any other individual or entity responsible for establishing deputy sheriff employment policies. In fact, Ward admitted that he had final decision-making authority to terminate Ward. (First Am. Compl. ¶ 37; Answer ¶ 20, DN 20). Furthermore, Wheeler has included in the record the "Hardin County Sheriff's Office Policy and Procedure Manual" which puts essentially *all* HCSO policymaking authority in the hands of the Sheriff. (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 2, at 1-6, 10, 29, 31, 38, DN 36-2). Thus, in his capacity as Hardin County Sheriff, Ward has final policymaking authority with respect to the employment of deputy sheriffs. Ward's actions, therefore, are the actions of the county for Section 1983 purposes. As such, Ward in his official capacity has no valid immunity defense, and his motion for summary judgment will be denied on this basis.

## 2.    *State Law Claims*

Defendants next argue that Kentucky immunity law bars Wheeler's state law claims for violations of KRS 15.520 against them in their official capacities. (Defs.' Mot. Summ. J. 13-16). As an initial matter, KRS 15.520 was amended in 2018, effective July 1, 2018. Because the events giving rise to this case occurred before the amendment's effective date and the amendment does not have retroactive application, the 2018 version is inapplicable to this case.[3] *See Elliott*, 540 S.W.3d at 353 n.1. The 2015 version of KRS 15.520 instead applies.

"Federal courts must apply state substantive law, including immunities, when dealing with supplemental state law claims in federal court." *Shepherd v. Floyd Cty.*, 128 F. Supp. 3d 976, 980 (E.D. Ky. 2015) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938)). "[A] sheriff is a county official and absent a waiver thereof is cloaked with sovereign immunity when sued in his official capacity." *Harlan Cty. v. Browning*, No. 2012-CA-000148-MR, 2013 WL 657880, at *2 (Ky. App. Feb. 22, 2013) (citation omitted). Additionally, a deputy sheriff is "entitled to the same immunity possessed by [the] Sheriff . . . in his official capacity[] while performing duties as deputy sheriff." *Id*. at *3. So, when sued in their official capacities, Sheriff Ward, Lieutenant Sheriff Rhinehart, and Deputy Sheriff Lee are cloaked with sovereign immunity, absent a waiver by the Kentucky legislature.

"In 1980, the Kentucky legislature enacted what is commonly referred to as the 'Police Officer's Bill of Rights.' The statute [i.e., KRS 15.520] provides certain procedural protections to officers employed by local governments that receive appropriations from the Commonwealth's general fund." *Seger v. City of Lancaster*, 930 F. Supp. 2d 821, 822 (E.D. Ky. 2013) (citing KRS

---

[3] Regardless, the 2018 amendments do not appear to affect the provisions pertinent to the pending motions.

15.520). Wheeler asserts a claim for violation of the procedural protections afforded by KRS 15.520. To the extent this statute applies to deputy sheriffs such as Wheeler, it would constitute a waiver of sovereign immunity. *See* KRS 15.520(8). However, the Kentucky Supreme Court recently ruled that KRS 15.520 does *not* apply to deputy sheriffs.[4] *See Elliott*, 540 S.W.3d at 356 (holding a sheriff's deputy was not entitled to the protections of KRS 15.520).

Like in *Elliott*, the starting point in analyzing this claim is the language of KRS 15.520. *Elliott* dealt with the 1994 version of KRS 15.520 which was amended in 2015. Regardless, the rationale of *Elliott* carries over to this Court's interpretation of the 2015 version of KRS 15.520. As the Court noted in *Elliott*, the 1994 version of KRS 15.520(4) "state[d] that the Police Officers' Bill of Rights 'shall apply only to *police officers* of local units of government who receive funds pursuant to KRS 15.410 through 15.992.'" *Elliott*, 540 S.W.2d at 355 (emphasis in original) (quoting 1994 version of KRS 15.520(4)).[5] Regarding the 2015 version of KRS 15.520, the pertinent amendment to that statute changed the scope of its protections to simply "officers" instead of "police officers." KRS 15.520(1)(h), (2), (11) (2015 version). However, the statute was *not* amended to include deputy sheriffs within the definition of "officer." KRS 15.520(1)(h). KRS 15.520(2). Further, the Police Officers' Bill of Rights was explicitly intended "to establish a

---

[4] Because Wheeler's statutory standing to assert a KRS 15.520 claim is a threshold issue in determining whether Defendants are immune from such claims, a telephonic conference was held to discuss the issue with the parties. (Telephonic Conference, DN 52). At that conference, the Court ordered supplementing briefing to address the applicability of KRS 15.520 to deputy sheriffs in light of *Elliott*. (Order 1, DN 53). The parties have now fully briefed the issue. (Pl.'s Suppl. Br., DN 54; Defs.' Suppl. Br., DN 55).

[5] When the Kentucky General Assembly amended KRS 15.520 in 2015, it actually created two separate statutory mechanisms for employing procedural due process protections, one applying to "officers" and one applying to "police officers." KRS 15.520(2) (2015 version); KRS 67C.326(1) (2015 version). The 2015 version of KRS 67C.326(1) is essentially the same statute as the 1994 version of KRS 15.520, so *Elliott* forecloses any claim afforded to Wheeler under that statute. In any event, Wheeler does not claim a violation of KRS 67C.326.

minimum system of conduct for *officers of local units* of government" within the state. KRS 15.520(2) (emphasis added). Kentucky law has long recognized that counties are not "local units of government," but are political subdivisions of the state. *See Lexington-Fayette Urban Cty. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004) (noting that counties are "an arm or political subdivision of the Commonwealth." (citing *Monroe Cty. v. Rouse*, 274 S.W.2d 477, 478 (Ky. 1955))); *Boyd Cty. ex rel. Hedrick v. MERSCORP, Inc.*, 614 F. App'x 818, 822 (6th Cir. 2015) ("The Kentucky constitution recognizes counties as subdivisions of the state and establishes several elected offices." (citing Ky. Const. §§ 99, 144))).

As the Court said in *Elliott*:

We also take note of the fact that KRS 15.520 was first enacted in 1980, while the specific due-process protections afforded to sheriffs' deputies outlined throughout KRS 70.260 through 70.273 were first enacted in 1992 and beyond. If the legislature truly meant for KRS 15.520 to apply to all law enforcement personnel, it would not have had to create a separate statutory framework for due-process rights afforded to sheriffs' deputies because KRS 15.520 appears to provide greater due process protection to police officers than KRS 70.260 through 70.273 provide to sheriff deputies. Both sets of statutes outline specific due-process rights for law enforcement personnel. But KRS 15.520 explicitly applies to *police officers*, not to *deputy sheriffs*, to which KRS 70.260 *et al.* apply. All of this leads us to the conclusion that KRS 15.520 was not meant to provide due process rights to sheriffs' deputies.

*Elliott*, 540 S.W.3d at 356 (emphasis in original) (citations omitted). As the Court in *Elliott* noted, KRS 70.260 through 70.273 explicitly provide procedural protections for deputy sheriffs where the county chooses to create a deputy sheriff merit board. If KRS 15.520 was meant to apply to deputy sheriffs, the Kentucky General Assembly would not have created the separate mechanism for protections explicitly afforded to deputy sheriffs in KRS 70.260 through 70.273. Additionally, if a county does not choose to create a deputy sheriff merit board, "[t]he sheriff may appoint his or her own deputies and may revoke the appointment at his or her pleasure, except where that revocation is prohibited by the provisions of KRS 70.260 to 70.273." KRS 70.030(1). Applying

KRS 15.520 to deputy sheriffs would render meaningless the sheriff's at-will power over deputies and the procedural protections of a deputy sheriff merit board available under KRS 70.260 to 70.273. "A . . . rule of [statutory] construction is that a statute should be construed, if possible, so that no part of its provisions are rendered meaningless." *Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth, Transp. Cabinet*, 983 S.W.2d 488, 492 (Ky. 1998) (citation omitted). As the Kentucky Supreme Court concluded in *Elliott*, it is clear that the Police Officers' Bill of Rights was not intended to apply to deputy sheriffs, like Wheeler.

For these reasons, Wheeler's KRS 15.520 claim will be dismissed.

**B.    Plaintiff's Motions for Leave to Amend Scheduling Order and File Amended Complaint; Defendant's Motion to Strike**

Wheeler moves under Fed. R. Civ. P. 16(b)(4) to amend the scheduling order to allow her to file a Second Amended Complaint naming Ward and Lee in their individual capacities.[6] (Pl.'s Mot. Leave File Am. Scheduling Order 1; Second Am. Compl., DN 35). Wheeler has since filed another motion for leave to file a Third Amended Complaint to add Richardson to this action and assert the same claims against Richardson as Wheeler asserts against the other parties.[7] (Pl.'s Mot. Leave File Am. Compl. ¶ 9, DN 44; Proposed Third Am. Compl., DN 46-2).

On April 23, 2019, the Magistrate Judge issued a scheduling order that set an August 1, 2019, deadline for the parties' filing of any amended pleadings. (Scheduling Order ¶ 4, DN 14).

---

[6] Strangely, Wheeler's proffered Second Amended Complaint makes no mention of asserting claims against Ward and Lee in their individual capacities. (Second Am. Compl. ¶¶ 2-3, DN 35). Thus, even if this amendment were allowed, Plaintiff would have no individual capacity claims against either Ward or Lee.

[7] Wheeler purports to assert claims against Rhinehart in his individual capacity and the HCSO in her proffered Third Amended Complaint in addition to adding individual capacity claims against Ward and Lee which were not included in the Second Amended Complaint. (Proposed Third Am. Compl. 8-11, DN 46-2). Wheeler makes no argument as to why she should be able to assert individual capacity claims against Rhinehart, so the Court will disregard that sought addition. Furthermore, as previously mentioned, the parties have already stipulated to the dismissal of the

On July 31, one day before the August 1 deadline, Wheeler filed an unopposed motion to join the HCSO as a defendant to her action. (Pl.'s Mot. Join, DN 25). The Magistrate Judge granted Wheeler's motion and gave Wheeler until September 9 to file an Amended Complaint adding the HCSO as a defendant. (Order, DN 28). On August 29, Wheeler filed her motion for leave to amend the scheduling order and file the Second Amended Complaint naming Ward and Lee in their individual capacities as defendants. (Pl.'s Mot. Leave File Am. Scheduling Order & Compl. 7). Then, on January 14, 2020, Wheeler filed another motion for leave to file a Third Amended Complaint to add Richardson to this lawsuit to assert claims against her. (Pl.'s Mot. Leave File Am. Compl. 3-4).

"[W]here a party seeks to amend its pleadings after a deadline set by court order, the party is effectively asking the court both to amend the scheduling order and for leave to amend its pleadings, and the party must show good cause in order to procure the court's consent." *Woodcock v. Ky. Dep't of Corr.*, No. 5:12-CV-00135-GNS-LKK, 2016 WL 3676768, at *1 (W.D. Ky. July 6, 2016) (quoting *Hildebrand v. Dentsply Int'l, Inc.*, 264 F.R.D. 192, 198 (E.D. Pa. 2010)). Because the Magistrate Judge's previous amendment of the scheduling order only allowed Wheeler to add the HCSO, not Ward and Lee as defendants in their individual capacities, Wheeler is essentially requesting another amendment of the scheduling order. This is true as well for Wheeler's requested amendment to add Richardson as a defendant.

"Because the Court had previously entered a scheduling order . . . dictating the deadlines for amending the pleadings, 'that rule's standards control.'" *Id*. (citation omitted). Under Fed. R. Civ. P. 16(b)(4), a scheduling order "may be modified only for good cause and with the judge's

---

HCSO as a party to this litigation, so the Court will disregard that sought addition, as well. (Stipulation Dismissal, DN 40).

consent." "Once the scheduling order's deadline passes, a plaintiff first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a)." *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003) (citation omitted); *see also Tschantz v. McCann*, 160 F.R.D. 568, 571 (N.D. Ind. 1995) ("[W]hile the absence of prejudice to a non-moving party may be relevant in determining whether leave to amend should be granted under Rule 15(a), it does not fulfill the 'good cause' requirement of Rule 16(b)." (quoting *Amcast Indus. Corp. v. Detrex Corp.*, 132 F.R.D. 213, 218 (N.D. Ind. 1990))). As this Court has noted:

> A court's evaluation of good cause is not co-extensive with an inquiry into the propriety of the amendment under . . . Rule 15. The "good cause" standard primarily considers the diligence of the party seeking the amendment. In other words, in order to demonstrate "good cause" a party must show that despite their diligence the time table could not have reasonable been met.

*Woodcock*, 2016 WL 3676768, at *1 (quoting *Tschantz*, 160 F.R.D. at 571). "[I]n addition to Rule 16's explicit "good cause" requirement, . . . a determination of the potential prejudice to the nonmovant also is required when a district court decides whether or not to amend a scheduling order." *Leary*, 349 F.3d at 909.

"The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (citations omitted). As it relates to her amendment to add claims against Ward and Lee in their individual capacities, Wheeler argues that her requested amendment "is prompted, in part, by factual revelations in Defendant's First Discovery Responses which were served very recently on August 13, 2019 and discovered by Plaintiff in the course of diligent review." (Pl.'s Mot. Leave File Am. Scheduling Order & Compl. 1). Wheeler also alleges that she did not know specifically how Ward, Lee, and Rhinehart "participated in her termination, given

that all conversations between them were private." (Pl.'s Mot. Leave File Am. Scheduling Order & Compl. 2). Wheeler maintains that "[a]t the time of the Complaint, [she] only knew that she was fired by Sheriff Ward after having been interviewed by Defendant Lee." (Pl.'s Mot. Leave File Am. Scheduling Order & Compl. 2). Wheeler additionally maintains that "[t]he scope of the investigation [leading to her termination] conducted by Defendant Ward and Lee was not previously known." (Pl.'s Mot. Leave File Am. Scheduling Order & Compl. 6).

Wheeler's excuses for not asserting claims against Ward and Lee in their individual capacities before the scheduling order's deadline are meritless. Wheeler's own averments in her Complaint, filed over seven months before the amended pleadings deadline, coupled with the exhibits attached to the Complaint, directly refute her general contention that she lacked the proper knowledge to assert a cause of action for, in essence, wrongful termination against Ward and Lee in their individual capacities. The May 23, 2018, letter Wheeler received outlining her suspension and the reasons for it came from Lee. (Compl. Ex. A, at 2). Lee and Rhinehart participated in the May 25 meeting where the allegations against Wheeler giving rise to her suspension and eventual termination were discussed. (Compl. ¶¶ 17, 20). The May 30 termination letter came from Ward. (Compl. Ex. C, at 2). Wheeler's June 15 request for "all documentation regarding the suspension that resulted in [her] termination" was addressed to Ward and Lee. (Compl. Ex. D, at 2). The June 19 response to her request came from Rhinehart. (Compl. Ex. E, at 2-7). One of the letters included in the June 19 response, a letter from an individual explaining her encounter with Wheeler while she was campaigning for Oden, appears to have been notarized by Ward. (Compl. Ex. E, at 4). Wheeler's allegations detailing the involvement of Ward, Lee, and Rhinehart in her termination clearly reflect her awareness that each of them had participated in the events giving rise to her Complaint.

16

Wheeler's only specific "factual revelation[]" sparking the assertion of the individual claims she seeks to assert against Ward and Lee is that Ward and Lee fired Wheeler without conducting an investigation. (Pl.'s Mot. Leave File Am. Scheduling Order & Compl. 3). Wheeler's original Complaint and First Amended Complaint, which was filed more than three months before the scheduling order deadline, allege violations of the Police Officers' Bill of Rights and procedural due process respectively. (Compl. ¶¶ 42-44; First Am. Compl. ¶¶ 48-53). Both of those claims contemplate the violation of certain procedural protections against wrongful termination. While the information discovered by Wheeler may provide more detail regarding her termination, it does not negate the knowledge she previously possessed of facts giving rise to claims against Ward and Lee in their individual capacities.

The situation at hand is similar to that in *Thomas v. Tennessee Department of Transportation*, 579 F. App'x 331 (6th Cir. 2014). In *Thomas*, the plaintiff sought to add a number of state officials to his Section 1983 lawsuit against the Tennessee Department of Transportation ("TDOT") two months after the scheduling order deadline. *Id*. at 333. The Sixth Circuit affirmed the district court's decision to deny the plaintiff's sought addition:

> [Plaintiff] . . . was required to show good cause for his failure to amend the complaint within the prescribed timeframe. The district court refused to permit [Plaintiff] to amend his complaint because he did not establish "that despite [his] diligence, [he] could not meet the original deadline." The district court concluded that [Plaintiff] was not diligent because he sought leave to amend the complaint almost two months after the scheduling order's deadline, *even though he knew the identity of the individual defendants before that deadline*. That decision was not an abuse of discretion, especially where TDOT's answer alerted [Plaintiff] to its sovereign-immunity defense. Although [Plaintiff] explained that he failed to meet the deadline because he wanted to use discovery to limit the number of defendants he added to the complaint, the district court acted within its discretion when it rejected that justification as insufficient.

*Id*. at 333-34 (emphasis added) (internal citations omitted); *see also Ross v. Am. Red Cross*, 568 F. App'x 296, 306 (6th Cir. 2014) ("A plaintiff does not establish 'good cause' to modify a case

schedule to extend the deadline to amend the pleadings *where she was aware of the facts underlying the proposed amendment to her pleading* but failed, without explanation, to move to amend the complaint before the deadline." (citing *Leary*, 349 F.3d at 908) (emphasis added)). Wheeler's lack of knowledge argument is simply unavailing. Wheeler "knew the identity of the individual defendants before [the scheduling order] deadline" and "was aware of the facts underlying the proposed amendment[s] to her [complaint] . . . ." *Thomas*, 579 F. App'x at 334; *Rose*, 567 F. App'x at 306. The fact that Wheeler did not know all of the details of her termination to the extent she would have liked is not an excuse—as the court concluded in *Thomas*. The discovery process is the tool by which the intricacies of a case are revealed, but the identities of the individuals involved in her termination were already known by Wheeler.

The only other specific argument Wheeler makes regarding good cause for her requested amendment is the purported difficulty she has had in receiving discovery responses from Defendants. (Pl.'s Mot. Leave File Am. Scheduling Order & Compl. 2, 4, 6). As noted above, information Defendants may have failed to provide to Wheeler is irrelevant in ascertaining whether she should have sought an amendment within the prescribed time based on the information she already possessed. Wheeler's arguments and the timing of her motion suggest that, in reality, the realization of the defect in her Complaint and First Amended Complaint, i.e., the failure to name two government officials in a Section 1983 lawsuit in their individual capacities after having already named them in their officials capacities, is what prompted the requested amendments, not a lack of knowledge or information or some reason amounting to "good cause." "The general rule is that '[a]ttorney neglect or inadvertence will not constitute good cause supporting modification.'" *State Farm Mut. Auto. Ins. Co. v. Nat'l Gen. Ins. Co.*, No. 1:15-cv-1314, 2017 WL 5197609, at *4

(W.D. Mich. Feb. 9, 2017) (quoting 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1522.2 (3d ed. August 2019 update)).

Regarding the prejudice prong of the Rule 16(b)(4) analysis, the individual claims that Wheeler purportedly sought to add with her tendered Second Amended Complaint almost a month after the scheduling order's deadline are nowhere to be found in the Second Amended Complaint. All claims therein are asserted against Ward and Lee solely in their official capacities. In *Inge*, however, the Sixth Circuit concluded that the trial court abused its discretion in denying the plaintiff's request to amend the scheduling order, finding an absence of prejudice "because Plaintiff's request to amend was a prompt effort to remedy pleading deficiencies identified by the district court in the dismissal order—*as opposed to an effort to add new claims or parties* . . . ." *Inge*, 281 F.3d at 626. The Sixth Circuit in *Inge* directly identified that some kind of prejudice inherently results from a plaintiff attempting to add new claims or parties after the scheduling order's deadline has passed.

The above analysis applies equally to Wheeler's motion for leave to file a Third Amended Complaint to assert claims against Richardson. Richardson is alleged to have notarized a letter written by one of the individuals stating that Wheeler had spoken about Ward's investigation of Smith. (Compl. Ex. E, at 13; Pl.'s Mot. Leave File Am. Compl. ¶¶ 2-3). Wheeler has since obtained an affidavit from that individual stating that he never signed the letter containing the accusations that Richardson notarized. (Pl.'s Mot. Leave File Am. Compl. Ex. B, at 5, ¶ 8, DN 44-2).

The issue with Wheeler's request is that she received the letter in question on or about June 19, 2018. (Scheduling Order ¶ 4; Compl. Ex. E, at 10, 13). There is no reason why Wheeler could not have discovered the information supporting claims against Richardson before the scheduling

order deadline.  Although Wheeler argues that she sought the individual's contact information in discovery but Defendants did not produce it, the individual's address *is on the letter*.  (Pl.'s Mot. Leave File Am. Compl. ¶ 5; Compl. Ex. E, at 13).  Although the individual had moved from that address by the time Wheeler filed her Complaint, he relocated two months earlier and had lived at that address for four months after Wheeler's termination.  (Pl.'s Mot. Leave File Am. Compl. Ex. B, ¶ 7; Compl. 11).  Wheeler could have easily discovered the individual's contact information or other information that would have prompted her to file a claim against Richardson by exercising diligence through a variety of investigative methods, discovery tools, and motions outside of simply asking Defendants for that information.  *Woodcock*, 2016 WL 3676768, at *1 (quoting *Tschantz*, 160 F.R.D. at 571); *Thomas*, 579 F. App'x at 334.  Her conclusory contentions otherwise are unavailing.  (Pl.'s Mot. Leave File Am. Compl. ¶¶ 5-6).

Another reason for denial of Wheeler's amendment to add Richardson is that her sought amendment appears to be futile.  Defendants assert that Wheeler's claims against Richardson are barred by the statute of limitations.  (Defs.' Obj. Pl.'s Mot. Leave File Am. Compl. 5-8, DN 48).  "As a general rule, a federal court sitting in Kentucky applies a one-year limitation to section 1983 actions pursuant to the law of the forum state."  *Smith v. City of Glasgow*, 809 F. Supp. 514, 514 (W.D. Ky. 1991) (citing *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179 (6th Cir. 1990)).  "The statute of limitations [in a Section 1983 action] commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action.  A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence."  *Sevier v. Turner*, 742 F.2d 262, 272-73 (6th Cir. 1984) (citations omitted).

For the same reasons that Wheeler cannot meet the "good cause" standard to amend her complaint, she cannot meet the "reasonable diligence" standard to consider her claim as having

been filed within the statute of limitations. Wheeler possessed the purported fraudulent letter notarized by Richardson since June 19, 2018. (Scheduling Order ¶ 4; Compl. Ex. E, at 10, 13). Although Wheeler argues that Richardson's signature could not be reasonably read to identify the notary on that letter, Wheeler could have discovered the purported fraudulent nature of that letter and Richardson's connection to it, within in the limitations period. Richardson's notary commission number is printed clearly on the letter. (Compl. Ex. E, at 5). Instead of utilizing this information, Wheeler waited more than eighteen months from the time she received the letter before attempting to assert a claim against Richardson.

Wheeler's attempt to invoke the relation-back rule of Fed. R. Civ. P. 15(c) to permit the assertion of her claims against Richardson can be summarily rejected. (Pl.'s Reply Defs.' Obj. Pl.'s Mot. Leave File Am. Compl. 3-4, DN 51). "[T]he precedent of this circuit clearly holds that 'an amendment which adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations.'" *In re Kent Holland Die Casting & Plating, Inc.*, 928 F.3d 1448, 1449 (6th Cir. 1991) (quoting *Marlowe v. Fisher Body*, 489 F.2d 1057, 1064 (6th Cir. 1973)). When "[t]he effect of [a] [p]laintiff's amendment is to add another party[,] [t]his establishes a new and independent cause of action which cannot be maintained when the statute has run, for the amendment is one of substance rather than one of form and brings into being one not presently in court." *U.S. for Use & Benefit of Statham Instruments, Inc. v. W. Cas. & Sur. Co.*, 359 F.2d 521, 523 (6th Cir. 1966). Fed. R. Civ. P. 15(c) is a vehicle that "allows the correction of misnomers, but not the addition or substitution of new parties after the statute of limitations has expired." *Kent Holland*, 928 F.2d at 1450 (citation omitted). By seeking to add Richardson to this action and asserting claims against her, Wheeler is "not seek[ing] to correct a misnomer or misdescription of a proper party . . . already in court [but rather is] attempt[ing] to circumvent the

statute of limitations, adding [a] new part[y] and new claims." *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, at 319 (6th Cir. 2010) (citations omitted). Simply put, Wheeler's attempted use of Fed. R. Civ. P. 15(c) as a means to add claims against a new party after the statute of limitations has passed is improper and not available as a means to add Richardson as a party to this case.

Finally, Wheeler's proposed additions of KRS 15.520 and procedural due process claims under the Fourteenth Amendment against Ward, Lee, and Richardson (and Rhinehart for that matter) in their individual capacities and Richardson in her official capacity appear to be substantively futile. (Proposed Third Am. Compl. 10-12). As explained earlier, because Wheeler has no standing to assert a KRS 15.520 claim, all of her claims predicated on violations of that statute fail. As for Wheeler's purported Section 1983 claims for violation of procedural due process under the Fourteenth Amendment: "Procedural due process claims are concerned not with the deprivation of a constitutionally protected interest in 'life, liberty, or property,' but deprivation of those interests without due process of law. . . . [A]n at-will employee 'is subject to dismissal at any time and without case' and, thus, has no protectable interest in her continued employment." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 546-47 (6th Cir. 2012) (citations omitted). As previously mentioned, KRS 70.030(1) allows a sheriff to "revoke the appointment [of his or her own deputies] at his or her pleasure," so that Wheeler "has failed to set out facts that would constitute an actionable procedural due process violation" against any defendant. *Id*.

For these reasons, Wheeler's motions will be denied.[8]

---

[8] Defendants' motion to strike will be denied, as well. There is no reason to strike Plaintiff's requested amendments from the record after they have already been denied. As a matter of clarity, Wheeler's First Amended Complaint (DN 17) is the controlling Complaint in this case.

## IV.    CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion for Summary Judgment (DN 24) is **GRANTED IN PART** and **DENIED IN PART**.   Plaintiff's KRS 15.520 claims are **DISMISSED**.   All other claims as outlined in Plaintiff's First Amended Complaint (DN 17) **SURVIVE**.

2.      Plaintiff's Motion for Leave to Amend Scheduling Order and File Amended Complaint (DN 29) is **DENIED**.

3.      Plaintiff's Motion for Leave to File Amended Complaint to Add Newly Discovered Claims (DN 44) is **DENIED**.

4.      Defendants' Motion to Strike (DN 47) is **DENIED**.

Greg N. Stivers, Chief Judge
United States District Court

March 23, 2020

cc:     counsel of record